IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOSHE HARTMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| ABRAHAM KLEINMAN, SOUTH SHORE TOWER 1 | ) | |
| LLC, an Illinois limited liability company, | ) | |
| CHICAGO FIRST TOWER LLC, an Illinois limited | ) | Jury Trial Demanded |
| liability company, CHICAGO SECOND TOWER LLC, | ) | |
| an Illinois limited liability company, | ) | |
| OHIO APARTMENT RENTAL HOLDINGS LLC, | ) | |
| an Ohio limited liability company, and | ) | |
| NOBLE PLACE APARTMENTS HOLDING LLC, | ) | |
| an Ohio limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Plaintiff, Moshe Hartman ("Hartman"), by and through his counsel of record, David A. Belofsky of David A. Belofsky & Associates, Ltd., and for his complaint against the Defendants, Abraham Kleinman. ("Kleinman"), South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC, states as follows:

## Parties

1.      Plaintiff Hartman is a resident of Brooklyn, New York and is domiciled in the State of New York.

2.      Defendant Kleinman is a resident of Newark, New Jersey and on information and belief is domiciled in the State of New Jersey.  The Commercial Driver License issued to Kleinman on March 15, 2019 by the Motor Vehicle Commission of the State of Jersey shows his

residential address as 93 Delavan Avenue, Newark, New Jersey 07104-4105.

3.     South Shore Tower 1 LLC is and has been since November 20, 2019 a limited liability company organized and existing under the laws of the State of Illinois.

4.     Chicago First Tower LLC is and has been since March 6, 2019 a limited liability company organized and existing under the laws of the State of Illinois.

5.     Chicago Second Tower LLC is and has been since March 6, 2019 a limited liability company organized and existing under the laws of the State of Illinois.

6.     Ohio Apartments Rental Holdings LLC is and has been since January 23, 2019 a limited liability company organized and existing under the laws of the State of Ohio.

7.     Noble Place Apartments Holding LLC is and has been since January 23, 2019 a limited liability company organized and existing under the laws of the State of Ohio.

### Jurisdiction

8.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

9.     This Court additionally has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 inasmuch as it concerns a claim arising under the Racketeering Influenced and Corrupt Organizations Act, codified as Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961, et seq.

10.     This Court may additionally have subject matter jurisdiction over one or more claims asserted herein under principles of supplemental jurisdiction.

### Venue

11.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §

1391(b)(2) in that a substantial part of the acts or omissions giving rise to the Plaintiff's claims occurred within this judicial district. Venue is also proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(3) and 19 U.S.C. § 1965(a) because Kleinman is doing business within the State of Illinois, South Shore Tower 1 LLC, Chicago First Tower LLC and Chicago Second Tower LLC are residents of the State of Illinois, and Kleinman has controlled the activities of Ohio Apartment Rental Holdings LLC and Noble Place Apartment Holding LLC in some material part from Illinois. All defendants are subject to the Court's jurisdiction.

**Factual Allegations Common to All Counts**

12.     Plaintiff first met Kleinman socially in or about December, 2012 and they subsequently became friends. During the course of their friendship, Kleinman held himself out to Hartman as a real estate expert experienced in the acquisition and management of income producing properties. The parties would periodically have dinner together and discuss real estate investment opportunities about which Kleinman was purportedly aware. These conversations in the early years were casual and the opportunities Kleinman described were not followed-up, at least by Hartman. The conversations did, however, persuade and induce Plaintiff to believe that Kleinman was a real estate expert experienced in the acquisition and management of income producing properties, including apartment buildings. By comparison, Hartman had little knowledge, experience, expertise or sophistication in matters concerning commercial real estate acquisition or management which Kleinman knew and understood.

13.     By 2018, Hartman had become close friends with Kleinman and had heard many stories from Kleinman about his successes in the fields of real estate acquisition, property management and construction. Over the years and many shared dinners, holidays and trips, Kleinman gained Hartman's full and complete and trust, and Hartman believed Kleiman as a

3

devout Orthodox Jew to be an honest man of unquestioned integrity.

14.     At the urging of Kleinman, Plaintiff in or about February, 2018 began to seriously entertain the idea of pursuing one or more investment opportunities identified by Kleinman. Kleinman explained that while he had little free capital to invest, he would be willing to participate in one or more real estate acquisition ventures with the Plaintiff in which Kleinman contributed all of his expertise and experience in real estate acquisition and management and Plaintiff contributed the necessary capital.   Kleinman explained and proposed that these contributions by the two of them, together with his anticipated supervision of property management, would be sufficiently equivalent to justify a 50/50 split of the equity in any new venture.

15.     Kleinman's proposal was subsequently refined by the parties to provide that Hartman's capital contribution in any new venture would be returned to him before any distribution of profits or gains would be made to members, and that any new venture would be jointly and equally managed as well as owned by both of them.  Kleinman agreed to these terms orally in or about March, 2018, and subsequently ratified them many times thereafter in other oral communications.

16.     On or about December 12, 2018, Kleinman identified an opportunity to acquire two apartment buildings in Cleveland, Ohio for the purchase price of about $2.5 million.  The properties, 2681-2689 Noble Road and 2461-2469 Noble Road (the "Ohio Properties"), are each comprised of approximately 25 rental units.  Hartman agreed to fund the acquisition of the properties for the approximate amount of $150,000 in addition to a purchase money mortgage to be obtained by the joint venture, with the understanding that title to each property would after closing be held in separate LLC's equally and exclusively owned and managed by Hartman and

Kleinman and that Hartman's contribution of capital towards the acquisition and initial operation the properties would be returned to him before any distribution of profits or gains would be made to members of either LLC. Kleinman repeatedly and expressly communicated his assent to these terms in oral communications to Hartman in the days and weeks prior to closing on the purchase of the Ohio Properties.

17. As part of their joint venture, Kleinman and Hartman agreed to establish and jointly own a company to manage their property acquisitions. On January 16, 2019, Kleinman asked Hartman what to name the new entity and Hartman responded with the idea of MAA Capital Management, which used an acronym for the names of the owners, Moshe And Abraham. On January 17, 2019, Kleinman applied to the New York Department of State Division of Corporations to establish MAA Capital Management LLC, and signed the Articles of Organization for the new entity as its "Managing Member" and "Organizer." Kleinman never disclosed to Hartman that he had formed MAA Capital Management LLC as its sole managing member in a manner contrary to their agreement, and instead told Hartman that they were 50% owners and co-managers of the limited liability company.

18. Hartman did not after January 17, 2019 receive any document from Kleinman showing Hartman's agreed upon 50% interest in and to MAA Capital Management LLC, and from time to time requested explanation from Kleinman about how their interests were documented. Kleinman repeatedly assured Hartman that they were 50% owners and co-managing members of the LLC but never gave Hartman any documentation to corroborate the representation despite requests for same by Hartman. Instead, Kleinman in response to Hartman's entreaties for acknowledgement of his ownership interests authorized the LLC's bank to recognize Hartman as a joint signatory on its bank account for a period of time until Kleinman

rescinded his authorization on May 20, 2020. He also had business cards printed showing Moshe Hartman was president of the entity. But with the exception of the attenuated joint signature authority over the LLC's bank account, Kleinman largely treated MAA Capital Management LLC after February, 2019 as his solely owned business, albeit one that was substantially funded by Hartman.

19. Hartman did not know of or discover the manner in which Kleinman had deceptively formed MAA Capital Management LLC until on or about May 20, 2020 when he discovered the truth of what had occurred.

20. On September 2, 2019 Hartman and Kleinman personally signed an office lease for MAA Capital Management LLC and Hartman agreed to and did fund the monthly rents for the office until the management company had the ability to pay rents out of current income.

21. Closing of the acquisition of the Ohio Properties occurred on or about February 28, 2019. Prior to closing, title to 2681-2689 Noble Road was held by Ohio Apartment Rental Holdings LLC and title to 2461-2469 Noble Road was held by Noble Place Apartments Holding LLC. Shortly before the closing Kleinman expressly represented to Hartman upon inquiry that both Kleinman and Hartman would after closing become managing members and 50% owners of each of the limited liability companies. Unbeknownst to Hartman, Kleinman immediately before closing caused all interest in and to Noble Place Apartments Holding LLC and Ohio Apartment Rental Holdings LLC to be assigned and transferred to himself at closing as the sole member of each limited liability company. Despite their agreement, Kleiman did not subsequent thereto include Hartman as a member or a manager of either limited liability company.

22. By the time of closing, Hartman had contributed approximately $150,000 in capital towards the purchase of the Ohio Properties.

6

23.     Hartman didn't become aware of Kleinman's duplicity concerning ownership of the Ohio Properties until on or about May 20, 2020 when he discovered the truth of what occurred.

24.     Moshe Hartman has periodically sought a written operating agreement from Kleinman memorializing the terms of their oral agreements regarding the Ohio Properties but Kleinman has failed to execute any written agreement consistent with the parties' oral agreements and has instead given Hartman many unfulfilled promises that he would do so and pretextual excuses for why he hasn't yet done so.

25.     After closing on the Ohio Properties, Moshe Hartman's wife Devorah Hartman began working full time in the office of MAA Capital Management LLC without pay.  Devorah Hartman has a background in property management, and she worked to rebuild the rent rolls and set up management systems for the Ohio Properties and assumed responsibility for tenant communications and processing their rents. Devorah Hartman became a bank account signatory as part of her role at MAA Capital Management LLC, managed accounts payable and receivable and undertook to process payroll and manage lease renewals.  She also attempted to supervise the activities of on-site property management staff and became a buffer between office staff and Kleinman, who she found to have an abrasive and intimidating style of management that caused employees to experience feelings of stress and harassment.

26.     Kleinman in comparison to Devorah Hartman did little work managing the Ohio Properties, and focused his attention on other potential deals and what he described as legal matters and re-financings.

27.     In the early part of 2019, Kleinman apprised Hartman of an opportunity to acquire rental apartment buildings in Chicago, Illinois located at 7105-7111 South Champlain Avenue,

633-641 East 71st Street, 7300-7302 South Wabash Avenue, 7548-7554 South Blackstone Avenue and 21-34 East 70th Street (the "Chicago Tower Properties"). Hartman agreed to fund the acquisition of the Chicago Tower Properties for the price of about $4.3 million in combination with a purchase money mortgage to be obtained by the joint venture, with the understanding and Kleinman's concurrence that title to the properties would after closing be held in limited liability companies equally and exclusively owned and managed by Hartman and Kleinman and that Hartman's contribution of capital towards the acquisition and initial operation the properties would be returned to him before any distribution of profits or gains would be made to members of the limited liability companies. Hartman and Kleinman also discussed and agreed that the Chicago Tower Properties if acquired would be managed through MAA Capital Management LLC so that Hartman's wife Devorah Hartman could personally assume responsibility for them in the same manner as she had for the Ohio Properties. Kleinman repeatedly and expressly communicated his assent to the foregoing terms in oral communications with Hartman in the days and weeks prior to closing on the purchase of the Chicago Tower Properties.

28. In or about late February or early March, 2019, Kleinman filed applications with the Illinois Secretary of State to form Chicago First Tower LLC and Chicago Second Tower LLC for the purpose of taking and holding title to the Chicago Tower Properties at closing. Unbeknownst to Hartman, Kleinman listed himself on the applications as the sole manager of the limited liability companies. On March 6, 2019, the Secretary of State approved the applications and Chicago First Tower LLC and Chicago Second Tower LLC were formed with Kleinman as their sole manager. Despite their agreement, Kleiman did not subsequent to formation include

Hartman as a member or a manager of Chicago First Tower LLC or Chicago Second Tower LLC.

29.     Closing on the acquisition of the Chicago Tower Properties occurred on or about May 14, 2019, at the conclusion of which title to the real estate known as 7105-7111 South Champlain Avenue and 633-641 East 71st Street was conveyed to Chicago First Tower LLC, and title to the real estate known as 7300-7302 South Wabash Avenue, 7548-7554 South Blackstone Avenue and 21-34 East 70th Street was conveyed to Chicago Second Tower LLC, entities in which Hartman at the time reasonably believed and continued to believe that he was a 50% owner and co-manager, until he recently learned otherwise.

30.     By the time of closing, Hartman had contributed more than $260,000 in capital towards the purchase of the Chicago Tower Properties.

31.     Moshe Hartman periodically sought written operating agreements from Kleinman memorializing the terms of their oral agreements regarding the Chicago Tower Properties but Kleinman failed to execute any written agreement consistent with the parties' oral agreements and has instead gave Hartman many unfulfilled promises that he would do so and pretextual excuses for why he hasn't yet done so.

32.     Hartman didn't become aware of Kleinman's duplicity concerning ownership of the Chicago Tower Properties until on or about May 20, 2020 when he discovered the truth of what occurred.

33.     After the acquisition of the Chicago Tower Properties, Devorah Hartman, working through the office of MAA Capital Management LLC, sought to manage the Chicago Tower Properties in the same manner as she sought to manage the Ohio Properties.

34.     In the latter part of 2019, Kleinman apprised Hartman of an opportunity to acquire rental apartment buildings in Chicago, Illinois located at 7808 South Shore Drive, 7708 South Shore Drive and 7835 South Shore Drive (the "South Shore Properties"). Hartman agreed to fund the acquisition of the properties for the price of $6,720,000 in combination with a purchase money mortgage to be obtained by the joint venture, with the understanding and Kleinman's concurrence that title to the properties would after closing be held in a LLC equally and exclusively owned and managed by Hartman and Kleinman and that Hartman's contribution of capital towards the acquisition and initial operation the properties would be returned to him before any distribution of profits or gains would be made to members of either LLC. Hartman and Kleinman also discussed and agreed that the properties if acquired would be managed through MAA Capital Management LLC so that Hartman's wife Devorah Hartman could personally assume responsibility for them in the same manner as she had for the Ohio Properties. Kleinman repeatedly and expressly communicated his assent to the aforesaid terms in oral communications with Hartman in the days and weeks prior to closing on the purchase of the South Shore Properties.

35.     In November, 2019, Kleinman filed an application with the Illinois Secretary of State to form South Shore Tower 1 LLC for the purpose of taking and holding title to the South Shore Properties. Unbeknownst to Hartman, Kleinman listed himself on the application as the sole manager and agent of the limited liability company. On November 20, 2019, the Secretary of State approved the application and South Shore Tower 1 LLC was formed with Kleinman as its sole manager and agent. Despite their agreement, Kleiman did not subsequent to formation include Hartman as a member or a manager of South Shore Tower 1 LLC.

36.     Closing on the acquisition of the South Shore Properties occurred on or about January 29, 2020 and title to the real estate was conveyed to South Shore Tower 1 LLC, an entity in which Hartman at the time reasonably believed he was a 50% owner and co-manager.

37.     Prior to the acquisition of the South Shore Properties, Moshe Hartman sought a written operating agreement from Kleinman memorializing the terms of their oral agreements regarding the properties.  Kleinman delayed and deferred the request for an operating agreement until the day of the closing on the purchase of the property, after substantial funding of the purchase had been made by Plaintiff, and then proposed an agreement that was materially inconsistent with what had previously been agreed to by the parties.  In particular, the written agreement proposed by Kleinman incorrectly gave him sole power of management of the LLC. As a consequence, Hartman declined to sign the written agreement proposed by Kleinman and instead insisted that Kleinman execute a proposed written agreement that was consistent with their oral agreements.  Although such a proposed written agreement was circulated to Kleinman by Hartman at or about the time of closing of the acquisition of the South Shore Properties, Kleinman did not sign it and the parties do not have a written agreement between them concerning their acquisition and management of the South Shore Properties.

38.     Due to concerns about financial consequences and legal liability, Hartman could not defer or delay closing of the purchase of the South Shore Properties once he discovered that Kleinman had not signed a document consistent with their oral agreement and understanding about the operation of South Shore Tower 1 LLC and their acquisition and management of the South Shore Properties.  Closing on the acquisition of the South Shore Properties occurred on or about January 29, 2020.

39.     After the acquisition of the South Shore Properties, Devorah Hartman, working through the office of MAA Capital Management LLC, sought to manage the South Shore Properties in the same manner as she sought to manage the Ohio Properties.

40.     Moshe Hartman continued to fund the operation of the Ohio Properties, the Chicago Tower Properties and the South Shore Properties as requested by Kleinman.

41.     While Kleinman did not affirmatively disclose to Moshe Hartman the true state of affairs concerning the ownership and operation of the Ohio Properties, the Chicago Tower Properties and the South Shore Properties, Devorah Hartman was able through her role in the office of MAA Capital Management LLC to apprise Moshe Hartman from time to time about the management of the properties to the extent of her knowledge and information.  Devorah Hartman did not, however, know or learn about the true state of affairs concerning the ownership and operation of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC prior to May 20, 2020.

42.     Within the past month, Kleinman has become non-responsive to communications from Hartman about his activities and has acted in a manner contrary to the parties' agreements. Kleinman removed Devorah Hartman as a signatory to the MAA Capital Management LLC bank accounts, and on or about May 20, 2020 took steps to lock her out of the company's computer system, the purchase of which Moshe Hartman had funded.  Later in the day of May 20, 2020, Kleinman deprived Devorah Hartman of access to her office email account and, without notice to her, told office staff that Devorah Hartman had left the company.  Kleinman was thereafter seen removing all computer equipment and files from the office, all without notice to or the consent of Hartman.

43.     Since May 20, 2020, Kleinman has failed and refused to give Hartman access to the books and records of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC or any information about the properties they own.

44.     Hartman has recently discovered that Kleinman has closed on the refinancing of the South Shore Properties within the past two weeks without obtaining any signed authorization from Hartman.  A copy of the $6,952,000 note dated May 29, 2020 and signed by Kleinman on behalf of South Shore Tower 1 LLC is attached hereto as Exhibit A.  Hartman does not know the extent to which Kleinman may have been able to take cash out of the refinancing, if any.  Had the South Shore Tower 1 LLC been properly set-up pursuant to the agreement between Hartman and Kleinman, the written signature of Moshe Hartman would have been required for any refinancing of the South Shore Properties in accordance with 805 ILCS 180/15-1(b)(2). Kleinman's refinancing of the South Shore Properties shows that Kleinman is continuing to treat the South Shore Tower 1 LLC as his solely owned property in breach of his contractual and fiduciary duties owed to Hartman.

45.     The foregoing facts show that Kleinman has affirmatively attempted to and did use Hartman's lack of knowledge, experience, expertise and sophistication in matters concerning commercial real estate acquisition, management and limited liability company organization and governance to his own advantage and to the disadvantage of Hartman.

46.     Shortly before the filing of the instant lawsuit, Hartman learned and alleges on information and belief that Kleinman may have misrepresented to one or more financial institutions in the course of obtaining financing for the acquisition of the Ohio Properties, the

Chicago Tower Properties and/or the South Shore Properties that he solely owned the respective entity that was to hold title to the real estate acquired.

47.     Hartman has also just discovered that Kleinman is attempting to obtain a second mortgage on one or more of the properties owned by South Shore Tower 1 LLC, Chicago First Tower LLC and/or Chicago Second Tower LLC for the purpose of taking cash out of the investments for his own exclusive benefit and to the detriment of Hartman.

48.     Attached hereto as Exhibit B is a copy of a "Limited Liability Operating Agreement for Chicago First Tower LLC" that Hartman has just discovered and obtained that bears Kleinman's typewritten signature; the document was deceptively prepared and supplied to a lender by Kleinman to induce it to loan money to Chicago First Tower LLC upon Kleinman's misrepresentation it was and is a single member limited liability company exclusively owned by Kleinman.

49.     Hartman has contributed more than $1 million towards the acquisition of the Ohio Properties, the Chicago Tower Properties and the South Shore Properties as well as the operation of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC.   To the best of Hartman's knowledge, information and belief, Kleinman has not similarly contributed any of his money.

## COUNT I
## BREACH OF FIDUCIARY DUTY

50.     Hartman adopts and realleges paragraphs 1-49 hereof as if fully set forth herein.

51.     By reason of their agreements and relationship, Kleinman owed Hartman the duty of a fiduciary duty to act with the highest good faith, undivided loyalty, candor, due care, integrity and fair dealing.

52.     Kleinman breached the fiduciary duties he owed to Hartman in one or more of the following respects:

A.      He disregarded Hartman's legal, equitable and financial interests in and to the Ohio Properties, the Chicago Tower Properties and the South Shore Properties;

B.      He disregarded Hartman's legal, equitable and financial interests in and to South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC;

C.      He failed to timely disclose to Hartman relevant information about his activities;

D.      He failed and refused to give Hartman access to the books and records of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC;

E.      He concealed and/or failed to disclose material information about the South Shore Properties, Chicago First Tower LLC, Chicago Second Tower LLC, and the Ohio Properties;

F.      He terminated Devorah Hartman from MAA Capital Management LLC without Hartman's consent and without good cause;

G.      He disregarded Hartman's legal, equitable and financial interests in and to MAA Capital Management LLC;

H.      He concealed and/or failed to disclose material information about MAA Capital Management LLC;

I.      He preferred his own interests at the expense and to the disadvantage of Hartman's interests;

J.      He usurped business opportunities;

K.      He misappropriated assets of their businesses;

L.      He mismanaged the Ohio Properties, the Chicago Tower Properties and the South Shore Properties; and

53.     He misrepresented material facts to Hartman.

54.     As a result of the conduct of Kleinman, Hartman has suffered substantial injury and damages and economic loss in an amount in excess of $75,000, exclusive of costs of suit.

55.     The aforementioned acts of Kleinman were done maliciously, oppressively and fraudulently, and Hartman is consequently entitled to an award of punitive and exemplary damages in an amount to be proved at trial.

WHEREFORE, Hartman prays that judgment be entered in his favor and against Kleinman in excess of $75,000.00, and that he be awarded punitive and exemplary damages in an amount to be proved at trial plus prejudgment interest, costs, attorney fees and such other and further legal and equitable relief as may be appropriate.

## COUNT II
## BREACH OF CONTRACT

56.     Hartman adopts and realleges paragraphs 1-49 hereof as if fully set forth herein.

57.     Kleinman breached his agreements with Hartman in one or more of the following respects:

A.      He did not include Moshe Hartman as a 50% owner and member of MAA Capital Management LLC;

B.  He deprived Moshe Hartman of the opportunity to participate in the management of MAA Capital Management LLC;

C.  He terminated Devorah Hartman from MAA Capital Management LLC without good cause;

D.  He did not include Moshe Hartman as a 50% owner and member of South Shore Tower 1 LLC;

E.  He impeded and/or prevented Moshe Hartman's participation in the management of South Shore Tower 1 LLC;

F.  He did not include Moshe Hartman as a 50% owner and member of Chicago First Tower LLC;

G.  He impeded and/or prevented Moshe Hartman's participation in the management of Chicago First Tower LLC;

H.  He did not include Moshe Hartman as a 50% owner and member of Chicago Second Tower LLC;

I.  He impeded and/or prevented Moshe Hartman's participation in the management of Chicago Second Tower LLC;

J.  He did not include Moshe Hartman as a 50% owner and member of Ohio Apartment Rental Holdings LLC;

K.  He impeded and/or prevented Moshe Hartman's participation in the management of Ohio Apartment Rental Holdings LLC;

L.  He did not include Moshe Hartman as a 50% owner and member of Noble Place Apartments Rental Holdings LLC;

M.    He impeded and/or prevented Moshe Hartman's participation in the management of Noble Place Apartments Rental Holdings LLC;

N.    He has not returned any of Moshe Hartman's capital contributed to South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC; and

O.    He has misrepresented to third parties that he is the sole managing member of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and/or Noble Place Apartments Rental Holdings LLC.

58.    Hartman also avers that Kleinman breached the implied covenant of good faith and fair dealing.

59.    As a consequence of Kleinman's breaches of agreement as aforesaid, Hartman has suffered substantial injury and damages and economic loss in an amount in excess of $75,000, exclusive of costs of suit.

WHEREFORE, Hartman prays that judgment be entered in his favor and against Kleinman in excess of $75,000.00, and that he be awarded prejudgment interest, costs, attorney fees and such other and further legal and equitable relief as may be appropriate.

**COUNT III**
**CLAIMS FOR ACCESS TO BOOKS AND RECORDS OF**
**SOUTH SHORE TOWER 1 LLC, CHICAGO FIRST TOWER LLC,**
**CHICAGO SECOND TOWER LLC, OHIO APARTMENT RENTAL HOLDINGS LLC**
**AND NOBLE PLACE APARTMENTS RENTAL HOLDINGS LLC**
**AND FOR ACCOUNTINGS**

60.    Hartman adopts and realleges paragraphs 1-49 hereof as if fully set forth herein.

61.    According to 805 ILCS 180/15-1, an Illinois limited liability company is a

member-managed limited liability company in the absence of an operating agreement. Each member has equal rights in the management and conduct of the company's business.

62.     The material provisions of 805 ILCS 180/10-15 require a limited liability company to "furnish information when any member demands it."

63.     Hartman made demand more than ten days ago to inspect the books and records of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC but has not been granted access to them. Alternatively, demand to inspect the books and records of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC would be futile because they are under exclusive control of the Kleinman, who is actively and intentionally attempting to prefer his own interests at the expense of Hartman.

64.     The full extent of Kleinman's mismanagement of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC and his misappropriation of their assets is unknown to Plaintiff.

65.     Kleinman has never accounted for the rents and profits received by South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC, the distribution of their profits, gains from their business or the monies received from the refinancing of their debt(s), if any.

66.     Plaintiff is legally and equitably entitled to accountings from Kleinman and South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment

Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC of all monies they have and should have received to-date, any distribution of profits or gains from their businesses and any monies received from the refinancing of their debts.

WHEREFORE, Hartman prays that judgment be entered in his favor and against Kleinman, that Kleinman be ordered to grant him access to the books and record the books and records of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC, that Kleinman be ordered to provide accountings for each of the aforesaid entities of all monies they have and should have received to-date, any distribution of profits or gains from their businesses and any monies received from the refinancing of their debts, that Plaintiff be awarded his costs and attorney fees incurred herein and such other and further legal and equitable relief as may be appropriate.

## COUNT IV
## CLAIMS FOR CONVERSION AGAINST KLEINMAN

67. Hartman adopts and realleges paragraphs 1-49 hereof as if fully set forth herein.

68. Hartman has a right to fifty percent (50%) of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including rights of management.

69. Hartman has an absolute and unconditional right to immediate possession as a member of fifty percent (50%) of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including rights of management.

70. Hartman has made a demand of Kleinman for possession of as a member of fifty

percent (50%) of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including rights of management. Alternatively, demand should be excused because it would be futile under the circumstances of Kleinman's intentional misconduct.

71. Kleinman has defendant wrongfully and without authorization assumed control, dominion, and ownership over Hartman's legal and equitable interest as a member of fifty percent (50%) of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including rights of management.

72. Kleinman's possession of Hartman's legal and equitable interest of no less than fifty percent (50%) of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including rights of management, subjects Hartman to continuing injury and irreparable harm.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment in favor of Plaintiff and against Kleinman and order that possession of Hartman's legal and equitable interest of no less than fifty percent (50%) of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including rights of management, be transferred and restored to him, that judgment be alternatively entered in his favor and against Kleinman in excess of $75,000.00, and that he be awarded prejudgment

interest, costs, attorney fees and such other and further legal and equitable relief as may be appropriate.

**COUNT V**
**CLAIMS FOR CONSTRUCTIVE TRUST, RESTITUTION,**
**INJUNCTIVE AND OTHER EQUITABLE RELIEF**

73.     Plaintiff adopts and realleges paragraphs 1-49 hereof as if fully set forth herein.

74.     As a consequence of Kleinman's deceptive and improper conduct as aforesaid, on grounds of good conscience and by reason of Hartman's equitable rights, this Honorable Court should impress a constructive trust over portions of no less than 50% of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC for the benefit of the Plaintiff.

75.     Plaintiff should be additionally granted restitution of all amounts that Kleinman unjustly and/or inequitably received from South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC which rightfully and in good conscience should and do belong to Hartman.

76.     Plaintiff is additionally entitled pursuant to 28 U.S.C. 2201 to a declaratory judgment that he is no less than a 50% owner of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including management rights.

77.     Plaintiff is additionally entitled to preliminary and permanent injunctive relief restraining and enjoining Kleinman from directly or indirectly interfering with Hartman's

exercise of his ownership interest of no less than 50% in South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including management rights.

78.      Plaintiff is additionally entitled to preliminary and permanent injunctive relief restraining and enjoining Kleinman from unilaterally acting without Hartman's express written authorization and consent to transfer, convey, assign, mortgage, pledge, encumber, hypothecate or otherwise burden or dispose of any interest in or to South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including but not limited to any tangible or intangible interest in property, real or personal, they or any of them may have.

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.      That this Honorable Court preliminarily and permanently restrain and enjoin Kleinman from unilaterally acting without Hartman's express written authorization and consent to transfer, convey, assign, mortgage, pledge, encumber, hypothecate or otherwise burden or dispose of any interest in or to South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including but not limited to any tangible or intangible interest in property, real or personal, they or any of them may have;

B.     That this Honorable Court impress a constructive trust over portions of no less than 50% of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC that should and do properly belong to the Plaintiff;

C.     That this Honorable Court grant Plaintiff restitution of all amounts that Kleinman unjustly and/or inequitably received from South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC;

D.     That this Honorable Court adjudge, declare and decree that Plaintiff is no less than a 50% owner of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC, Noble Place Apartments Rental Holdings LLC and MAA Capital Management LLC, including management rights; and

E.     That this Honorable Court enter a judgment in his favor and against Kleinman in excess of $75,000.00, and that he be awarded prejudgment interest, costs, attorney fees and such other and further legal and equitable relief as may be appropriate.

## COUNT VI
## RICO § 1962(c) CLAIM AGAINST KLEINMAN

79.     This Count is against Kleinman individually.

80.     Plaintiff adopts and realleges paragraphs 1-49 hereof as if fully set forth herein.

81.     MAA Capital Management LLC is an enterprise engaged in and whose activities affect interstate commerce.  Kleinman is employed by or associated with the enterprise.

82.     Kleinman did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiff.   Specifically, Kleinman used MAA Capital Management LLC to maintain and perpetuate the fiction that the Ohio Properties, the South Shore Properties and the Chicago Tower Properties were being managed in substantial part for Hartman's benefit so that Kleinman could continue to fraudulently receive Hartman's money without any corresponding benefit to Hartman.

83.     Kleinman intentionally sought to fraudulently deprive Hartman of money that Kleiman deceptively characterized as capital contributions through the use of interstate communications devices that send, receive, or otherwise transmit messages across state lines.

84.     Kleinman's fraudulent scheme was intended to solely benefit Kleinman.

85.     Each communication by Kleinman to fraudulently deprive Hartman of money that Kleiman deceptively characterized as a capital contribution constituted a separate offense of wire fraud.

86.     Pursuant to and in furtherance of his fraudulent scheme, Kleinman committed multiple related acts of wire fraud in violation of 18 U.S.C. § 1343 by soliciting through electronic means and communications capital contributions from Hartman for use by MAA Capital Management LLC on the dates of or about October 3, 2019, November 1, 2019, December 5, 2019, December 11, 2019 and January 27, 2020, each of which were described by Kleiman as necessary for their business.   In reliance upon and response to Kleinman's solicitations, Hartman wrote and delivered a check payable to MAA Capital Management LLC in the amount of $20,000 on October 3, 2019; wrote and delivered a check payable to MAA Capital Management LLC in the amount of $25,000 on November 1, 2019; wrote and delivered a

25

check payable to MAA Capital Management LLC in the amount of $75,000 on December 11, 2019; wired funds for delivery to the bank account of MAA Capital Management LLC in the amount of $140,000 on January 27, 2020; and wired funds for delivery to the bank account of MAA Capital Management LLC in the amount of $25,000 on February 28, 2020.

87.     The multiple related acts of wire fraud as aforesaid constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

88.     Kleinman's participation in the scheme to defraud Hartman of his money was intentional; he knew at the time of his communications that it was reasonably foreseeable that Hartman would be deprived and defrauded of his money as a consequence of Kleinman's electronic communications.

89.     As a direct and proximate result of Kleinman's racketeering activities and violations of 18 U.S.C. § 1962(c), Hartman has been injured in his business and property.

WHEREFORE, Plaintiff requests that this Court enter judgment against Kleinman for treble damages in excess of $75,000, plus costs, attorney fees, and such other and further relief as the Court deems appropriate.

## COUNT VII
## CLAIM FOR COMMON LAW FRAUD AGAINST KLEINMAN

90.     This Count is against Kleinman individually.

91.     Plaintiff adopts and realleges paragraphs 1-49 hereof as if fully set forth herein.

92.     Kleinman intentionally made the aforesaid misrepresentations of material facts to Hartman for the purpose of inducing him to part with his money and to enable Kleinman to acquire the aforesaid real estate without regard for the harm to Hartman.

93.     Kleinman knew that his representations as aforesaid were untrue when made and also knew or should have known that Hartman would rely upon them to his detriment in

providing monies as aforesaid.

94.     Hartman reasonably relied upon the representations of Kleinman when and after they were made in providing monies to MAA Capital Management LLC, South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC, and other monies used in connection with the acquisition of the Ohio Properties, the Chicago Tower Properties and the South Shore Properties.

95.     As a consequence of Kleinman's conduct as aforesaid, Hartman sustained lossess of hundreds of thousands of dollars in monies taken from him under false pretenses, plus lost interest and attorney fees.

96.     Kleinman's intentional misconduct warrants an award of punitive damages in an amount sufficient to adequately punish him for his misconduct and deter similar conduct by him and others in the futures.

WHEREFORE, Hartman prays that judgment be entered in his favor and against Kleinman in excess of $75,000.00, and that he be awarded punitive and exemplary damages in an amount to be proved at trial plus prejudgment interest, costs, attorney fees and such other and further legal and equitable relief as may be appropriate.

## COUNT VIII
## DERIVATIVE CLAIMS AGAINST KLEINMAN

97.     This Count is against Kleinman individually.

98.     Plaintiff adopts and realleges paragraphs 1-49 hereof as if fully set forth herein.

99.     This Count is brought derivatively on behalf of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC, which are sued herein as nominal

defendants.

100.     Demand on Kleinman to institute suit against himself would be futile because he is presently acting as the only member of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC, and as the wrongdoer involuntarily accused herein, Kleinman would not sue himself or authorize the entities to bring such an action.

101.     Kleinman has committed waste, fraud and/or abuse of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC, and has neglected the properties they own to their detriment.

102.     Kleinman owes a duty to the entities as a fiduciary to prevent waste, fraud, abuse and neglect, and has materially breached those duties in one or more respects as aforesaid.

103.     As a consequence of Kleinman's conduct as aforesaid, South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC have been injured and sustained damages in excess of $75,000.

WHEREFORE, Hartman prays that judgment be entered in favor of South Shore Tower 1 LLC, Chicago First Tower LLC, Chicago Second Tower LLC, Ohio Apartment Rental Holdings LLC and Noble Place Apartments Rental Holdings LLC and against Kleinman in excess of $75,000.00, and that an appropriate award be made of prejudgment interest, costs, attorney fees and such other and further legal and equitable relief as may be appropriate.

**JURY DEMAND**

Plaintiff demands trial by jury.

Moshe Hartman,

By: _____ /s/ David Belofsky _____
                    One of his attorneys

David A. Belofsky (ARDC No. 6180049)
David A. Belofsky & Associates, Ltd.
150 North Michigan Avenue
Suite 1230
Chicago, Illinois 60601
Tel: (312) 759-3737
Email: david@belofsky.com

# MULTIFAMILY NOTE

US $6,952,000.00            May 29, 2020

      **FOR VALUE RECEIVED**, the undersigned ("**Borrower**") promises to pay to the order of ARBOR COMMERCIAL FUNDING I, LLC, a New York limited liability company ("**Lender**"), the principal amount of SIX MILLION NINE HUNDRED FIFTY TWO THOUSAND AND 00/100 Dollars (US $6,952,000.00) (the "**Mortgage Loan**"), together with interest thereon accruing at the Interest Rate on the unpaid principal balance from the date the Mortgage Loan proceeds are disbursed until fully paid in accordance with the terms hereof and of that certain Multifamily Loan and Security Agreement dated as of the date hereof, by and between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

## 1. Defined Terms.

      Capitalized terms used and not specifically defined in this Multifamily Note (this "**Note**") have the meanings given to such terms in the Loan Agreement.

## 2. Repayment.

      Borrower agrees to pay the principal amount of the Mortgage Loan and interest on the principal amount of the Mortgage Loan from time to time outstanding at the Interest Rate or such other rate or rates and at the times specified in the Loan Agreement, together with all other amounts due to Lender under the Loan Documents. The outstanding balance of the Mortgage Loan and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date, together with all other amounts due to Lender under the Loan Documents.

## 3. Security.

      The Mortgage Loan evidenced by this Note, together with all other Indebtedness is secured by, among other things, the Security Instrument, the Loan Agreement and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## 4. Acceleration.

      In accordance with the Loan Agreement, if an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any accrued and unpaid interest, including interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other amounts payable under this Note, the Loan Agreement and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to

Borrower, unless applicable law requires otherwise (and in such case, after satisfactory notice has been given).

**5.      Personal Liability.**

The provisions of Article 3 (Personal Liability) of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

**6.      Governing Law.**

This Note shall be governed in accordance with the terms and provisions of Section 15.01 (Governing Law; Consent to Jurisdiction and Venue) of the Loan Agreement.

**7.      Waivers.**

Presentment, demand for payment, notice of nonpayment and dishonor, protest and notice of protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, and grace and diligence in collecting the Indebtedness are waived by Borrower, for and on behalf of itself, Guarantor and Key Principal, and all endorsers and guarantors of this Note and all other third party obligors or others who may become liable for the payment of all or any part of the Indebtedness.

**8.      Commercial Purpose.**

Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise or activity, and not for agricultural, personal, family or household purposes.

**9.      Construction; Joint and Several (or Solidary, as applicable) Liability.**

(a)      Section 15.08 (Construction) of the Loan Agreement is hereby incorporated herein as if fully set forth in the body of this Note.

(b)      If more than one Person executes this Note as Borrower, the obligations of such Person shall be joint and several (solidary instead for purposes of Louisiana law).

**10.     Notices.**

All Notices required or permitted to be given by Lender to Borrower pursuant to this Note shall be given in accordance with Section 15.02 (Notice) of the Loan Agreement.

**11.     Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Note, time is of the essence.

12.     **Loan Charges Savings Clause.**

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Mortgage Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents. Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Mortgage Loan, or on acceleration of the maturity of the Mortgage Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Mortgage Loan without the payment of any prepayment premium (or, if the Mortgage Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Mortgage Loan. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Mortgage Loan.

13.     **WAIVER OF TRIAL BY JURY.**

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**14.**     **Receipt of Loan Documents**.

Borrower acknowledges receipt of a copy of each of the Loan Documents.

**15.**     **Incorporation of Schedules**.

The schedules, if any, attached to this Note are incorporated fully into this Note by this reference and each constitutes a substantive part of this Note.

**ATTACHED SCHEDULE.**  The following Schedule is attached to this Note:

☐          Schedule 1          Modifications to Note

**[Remainder of Page Intentionally Blank]**

   **IN WITNESS WHEREOF**, Borrower has signed and delivered this Note under seal (where applicable) or has caused this Note to be signed and delivered under seal (where applicable) by its duly authorized representative.  Where applicable law so provides, Borrower intends that this Note shall be deemed to be signed and delivered as a sealed instrument.


BORROWER:

**SOUTH SHORE TOWER 1 LLC**, an Illinois limited liability company


By: _____

Name:  Abraham Kleinman

Title:  Sole Managing Member

PAY TO THE ORDER OF _____ WITHOUT
RECOURSE

LENDER:

ARBOR COMMERCIAL FUNDING I, LLC, a
New York limited liability company

By: _____
       Name:    Kenneth Dowling
       Title:    Senior Vice President, Capital Markets

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## FOR

## Chicago First Tower LLC

## <u>ARTICLE 1</u>

## Company Formation

**1.1 FORMATION.** The Members hereby does form a Limited Liability Company ("Company") subject to the provisions of the Limited Liability Company Act as currently in effect as of this date. Articles of Organization shall be filed with the Secretary of State.

**1.2 NAME.** The name of the Company shall be: **Chicago First Tower LLC**

**1.3 MEMBERS.** The name and place of residence of the members are:

1) **Abraham Kleinman**
**199 Lee Avenue, Suite 955**
**Brooklyn, NY 11211**

**1.4 TERM.** The Company shall continue for a perpetual period unless,

(a) The Members votes for dissolution;

(b) Any event which makes it unlawful for the business of the Company to be carried on by the Members.

(c) Any other event causing dissolution of this Limited Liability Company under the laws of the State of ILLINOIS.

**1.5 CONTINUANCE OF COMPANY.** Notwithstanding the provisions of ARTICLE 1.4, in the event of an occurrence described in ARTICLE 1.4(c), if there is at least one remaining Member, said remaining Member shall have the right to continue the business of the Company. Such right can be exercised by the written vote of the remaining Member within ninety (90) days after the occurrence of an event described in ARTICLE 1.4(c). If not so exercised, the right of the Member to continue the business of the Company may expire if that member desires.

**1.6 BUSINESS PURPOSE.** The purpose of the Company is Real Estate Investment

**1.7 PRINCIPAL PLACE OF BUSINESS.** The location of the principal place of business of the Company shall be:

**199 Lee Avenue**
**Brooklyn, NY 11211**

The principal place of business may be changed to a location the Members may select. They

may also choose to store company documents at any address the Members chooses.

EXHIBIT B

1.8 **ADMISSION OF ADDITIONAL MEMBERS.** Except as otherwise expressly provided in the Agreement, additional members may be admitted to the Company through written consent of all Members.

## ARTICLE 2

### Profits, Losses and Distributions

2.1 **PROFITS/LOSSES.** For financial accounting and tax purposes the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Exhibit 2 as amended from time to time in accordance with Treasury Regulation 1.704-1.

2.2 **DISTRIBUTIONS.** The Members shall determine and distribute available funds annually or at more frequent intervals as the Members sees fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Members. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to Treasury Regulation 1.704-l(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in Treasury Regulation 1.704-l(b)(2)(ii)(d).

2.3 **C CORPORATION ELECTION.** The Members may elect to be treated as a C corporation at any time to keep the profits of the LLC at the company level and not be forced to distribute profits to the Members.

## ARTICLE 3

### Management

3.1 **MANAGEMENT OF THE BUSINESS.** The management of the business is invested in the Members.

3.2 **MEMBERS.** The liability of the Members shall be limited as provided pursuant to applicable law. The Members is in control, management, direction, and operation of the Company's affairs and shall have powers to bind the Company with any legally binding agreement, including setting up and operating a LLC company bank account.

3.3 **POWERS OF THE MEMBERS.** The Member is authorized on the Company's behalf to make all decisions in accordance with ARTICLE 4.2 as to (a) the sale, development lease or other disposition of the Company's assets; (b) the purchase or other acquisition of other assets of all kinds; (c) the management of all or any part of the Company's assets; (d) the borrowing of money and the granting of security interests in the Company's assets; (e) the pre-payment, refinancing or extension of any loan affecting the Company's assets; (f ) the compromise or release of any of the Company's claims or debts; and, (g) the employment of persons, firms or corporations for the operation and management of the company's business. In the exercise of its management powers, the Member is authorized to execute and deliver (a) all contracts, conveyances, assignments leases, sub-leases, franchise agreements, licensing agreements,

management contracts and maintenance contracts covering or affecting the Company's assets; (b) all checks, drafts and other orders for the payment of the Company's funds; (c) all promissory notes, loans, security agreements and other similar documents; and, (d) all other instruments of any other kind relating to the Company's affairs, whether like or unlike the foregoing.

3.4 **NOMINEE.** Title to the Company's assets shall be held in the Company's name or in the name of any nominee that the Member may designate. The Member shall have power to enter into a nominee agreement with any such person, and such agreement may contain provisions indemnifying the nominee, except for his willful misconduct.

3.5 **COMPANY INFORMATION.** Upon request, the Chief Executive Member shall supply to any member information regarding the Company or its activities. Each Member or his authorized representative shall have access to and may inspect and copy all books, records and materials in the Chief Executive Member's possession regarding the Company or its activities.

3.6 **EXCULPATION.** Any act or omission of the Members, the effect of which may cause or result in loss or damage to the Company or the Members if done in good faith to promote the best interests of the Company, shall not subject the Members to any liability to the Members.

REGISTERED AGENT. The name and location of the registered agent of the Company  shall be:
Chicago First Tower LLC
199 Lee Avenue Brooklyn, NY
11211

3.7  **INDEMNIFICATION.** The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Member acted in good faith and in a manner he/she reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he/she reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful.

3.8 **RECORDS.** The Members shall cause the Company to keep at its principal place of business  or other location the following:

(a) A copy of the Certificate of Formation and the Company Operating Agreement and all amendments;

(b) Copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years;

(c) Copies of any financial statements of the limited liability company for the three most recent years.

## ARTICLE 4

### Compensation

4.1 **MEMBER MANAGEMENT FEE.** Any Member rendering services to the Company shall be entitled to compensation commensurate with the value of such services.

4.2 **REIMBURSEMENT.** The Company shall reimburse the Members for all direct out-of-pocket expenses incurred by the Members in managing the Company.

## ARTICLE 5

### Bookkeeping

5.1 **BOOKS.** The Members shall maintain complete and accurate books of account of the Company's affairs at the Company's principal place of business or other agreed location. Such books shall be kept on such method of accounting as the Members shall select. The company's accounting period shall be the calendar year.

5.2 **MEMBER'S ACCOUNTS.** The Members shall maintain separate capital and distribution accounts for each member. Each member's capital account shall be determined and maintained in the manner set forth in Treasury Regulation 1.704-l(b)(2)(iv) and shall consist of his initial capital contribution increased by:

(a) Any additional capital contribution made by him/her;

(b) Credit balances transferred from his distribution account to his capital account; and decreased by:

(a) Distributions to him/her in reduction of Company capital;

(b) The Member's share of Company losses if charged to his/her capital account.

5.3 **REPORTS.** The Members shall close the books of account after the close of each calendar year, and shall prepare and send to each member a statement of such Member's distributive share of income and expense for income tax reporting purposes.

## ARTICLE 6

### Transfers

6.1 **ASSIGNMENT.** According to the appropriate Court, should the Members have a creditor with a judgment that was issued an assignment of the membership interest, the creditor shall only obtain an assignment of the membership interest, not the actual transfer of Membership in the LLC. The new assignee does not have any rights of the Members or have the ability to be involved in management of the LLC or the right to dissolve the LLC. The new assignee is only

granted rights of the distributions of the Member's interests, if the Members decides to distribute at all, not the rights of membership. The assignee must release the Member's interests back to Member upon payment of the judgment in accordance with the appropriate Court.

## ARTICLE 7

### Dissolution

7.1 **DISSOLUTION.** The Members may dissolve the LLC at any time. The Members may NOT dissolve the LLC for a loss of membership interests. Upon dissolution the LLC must pay its debts first before distributing cash, assets, and/or initial capital to the Member or the Members interests. The dissolution may only be ordered by the Members, not by the owner of the Members interests.

## CERTIFICATE OF FORMATION

This Company Operating Agreement is entered into and shall become effective as of the Effective Date by and among the Company and the person executing this Agreement as Members. It is the Member's express intention to create a limited liability company in accordance with applicable law, as currently written or subsequently amended or redrafted.

The undersigned hereby agree, acknowledge, and certify that the foregoing operating agreement is adopted and approved by each member. The agreement, consisting of **5** pages, constitutes the Operating Agreement of **Chicago First Tower LLC** adopted by the members

SIGNED AND AGREED

_____

**Member 1 name**

**1) Abraham Kleinman**

**Member Interest Schedule**

**ABRAHAM KLEINMAN** -100% Interest